Grace TURNER, Appellant,

v.

The MANHATTAN LIFE INSURANCE COMPANY, a New York Corporation, Appellee.

No. 18272.

United States Court of Appeals
Ninth Circuit.

July 10, 1963.

Rehearing Denied Aug. 31, 1963.

**554**

John F. O'Dea, San Francisco, Cal., for appellant.

Thacher, Jones, Casey & Ball, James F. Thacher, San Francisco, Cal., for appellee.

Before HAMLIN, Circuit Judge, MADDEN, Judge of the Court of Claims, and JERTBERG, Circuit Judge.

MADDEN, Judge.

This is a suit by the assignee of the beneficiary of a policy of life insurance. The suit was brought in the Superior Court of the State of California, and was removed by the defendant, the insurance company, to the United States District Court for the Northern District of California, Southern Division. That court rendered judgment for the defendant, and the plaintiff took a timely appeal to this court. In this opinion the appellant will be referred to as the plaintiff, and the appellee will be referred to as the defendant.

In the district court, the defendant asserted that the insured had, in connection with the application for the insurance policy here in question, made false statements in response to questions asked him in his medical examination. The district court made findings that the insured had knowingly made false statements and that the statements were relied upon by the defendant to the degree that it would not have issued the policy if it had known the true facts. The plaintiff, in this appeal, urges that those findings are not supported by the evidence. She also asserts other errors, which will not be discussed in this opinion.

The insured was Nobel Andre, who, in 1959 when the policy was issued, was 48 years old. He was the president of the Andre Paper Box Co., Inc., and the defendant's agent stated on the application for the policy that he had an income of $50,000 a year. Andre never approached any one connected with the defendant company for the purpose of purchasing insurance. The defendant's agent, Mr. Crooks, had for five years, from time to time, sought to sell him insurance, before he succeeded in selling him the policy here in question. The Andre Paper Box Company was named in the policy as owner and beneficiary, and the premium notices were to be sent to that company.

The General Agent of the defendant in San Francisco was Mr. John Fixa, and Mr. Harold Horwitz was a member of his staff. Dr. L. Gordon La Pointe, M.D. was vice president and medical director of the defendant. As early as January of 1958 Crooks, through Fixa, submitted to

La Pointe a trial application for insurance on Andre. Fixa wrote La Pointe

"This applicant was rated by Pacific Mutual in 1956. If the situation can be improved we can place a nice case."

By "rated" was meant that Pacific Mutual had issued insurance on Andre, but had charged a premium higher than normal because it did not regard him as a normal risk. Crooks testified that the rating was Class F plus $50 per thousand of insurance. The application to Pacific Mutual had been for $100,000 of insurance. Pacific Mutual had granted only $25,000 at the extraordinarily high premium, and even then had reinsured part of the risk with two other companies.

This 1958 application contained a copy of an electrocardiogram made in December, 1957, not in connection with an application for insurance. We shall have occasion to refer to that document hereinafter.

On April 2, 1958 La Pointe wrote Fixa:

"Re Noble (sic) Andre

"The data received from the applicant's attending physician is not very helpful and we doubt we could offer more than $20,000 of our Class F.

"We believe the applicant's status is worse than in August, 1956, but we are willing to review any old ECG's besides the December, 1957, tracing as well as a new one without expense to the company."

ECG, in the quoted letter means electrocardiogram. Hereinafter EKG, apparently more commonly used by the doctors, will be used as the abbreviation for electrocardiogram. It should be noted that attached to the trial application of January, 1958, was the medical examination of Andre by Dr. Leigh Rodgers, the defendant's medical examiner, made for Pacific Mutual, for which company also Dr. Rodgers was the examiner. This examination had been made on July 27, 1956. That medical report showed that Andre had just been refused insurance by another company because of EKG findings.

In that medical report Dr. Rodgers had said that there was no history to indicate heart disease "but EKG suggestive of past myocardial damage."

On the basis of the above information, La Pointe made his offer of $20,000 of insurance at a high rating, and Andre declined the proposal. But Crooks and Fixa did not abandon the effort to sell some insurance on Andre's life.

On January 23, 1959 Fixa sent to La Pointe an application, including a medical examination report and an EKG. He wrote:

"We are submitting this case on a con-current basis with Pacific Mutual. We will give a 'target' as soon as we know what Pacific Mutual is going to do.

"Harold Horwitz."

The defendant had an authorization from Andre to request his physician to furnish to defendant any information that he had. On January 29, 1959, the defendant wrote Dr. Victor Holliger of San Francisco, Andre's personal physician, attaching a copy of its authorization from Andre, and saying:

"Please comment re. checkups including any data since your report to us of March 25, 1958."

On the same day, January 29, Edward Sottolano, signing himself "Underwriter" for the defendant, wrote Fixa in San Francisco that the defendant was willing to consider $25,000 only at a potential rating of Class D plus $15 per thousand extra for three years, without features. He said further:

"It is essential that we hear from you as quickly as possible regarding our offer inasmuch as upon receipt of the outstanding attending physician's statement, we wish to be in a position of issuing or filing."

On February 3, 1959, Fixa wrote to La Pointe:

"This looks like a good offer. Go ahead and send it down when you can."

Dr. Holliger wrote La Pointe on February 16, as follows:

"I have very little to add to the information that you already have regarding Mr. Andre."

"I have insisted on seeing Mr. Andre at regular intervals, but I have failed to demonstrate any cardiac disease."

"When last seen, February 6, 1959, his blood pressure was 120/80. His heart had a normal rate, rhythm and tone. He had no complaints and presented no problems. In the course of the last several months he had been under treatment for a mild, epicondyletis, due to an injury to his elbow."

"If there is any further information you may wish, I shall be most happy to supply it."

Pacific Mutual having received the same report of medical examination by the same Dr. Rodgers, and the same EKG which La Pointe received, declined to write any insurance on the application. Crooks notified Horwitz, of the defendant's general agent's office, of that fact. It will be remembered that, on January 23, Fixa had written La Pointe that "We will give a 'target' as soon as we know what Pacific Mutual is going to do."

On March 3, 1959 La Pointe wrote Fixa:

"The file on the above has been reviewed and we are approving the case for $25,000 only, rated Class D plus $15.00 per thousand extra for three years, without features."

On March 4, the defendant sent the policy to Fixa, its general agent with the instruction not to deliver it until it had obtained the signatures of the insured, Andre, and the owner of the policy, Andre Paper Box Co., Inc. to an enclosed amendment.

The amendment said:

"$25,000—only whole Life Reducing Premium, special premium class, annual premium 1st 3 years $1819.00, next 7 years $1444.00, next 10 years $1299.75, thereafter 1155.50."

The amendment was agreed to by the insured, and by the Andre Paper Box Co., Inc., the owner of the policy. The premium rates specified in the amendment are impressive. They are 350% of regular rates, plus a surcharge, for the first three years of $15 per thousand per annum. The defendant's examining doctor, Dr. Rodgers, had noted in his report, in answer to the question

"Has proposed insured ever applied for life insurance or reinstatement, without receiving such policy or reinstatement, or been declined, rated up, issued a policy other than applied for? (If yes, name each company and give approximate date.)"

The answer was:

"Declined by Canada Life, 1956.
"Rated by P.M. (Pacific Mutual) 1956."

Dr. Rodgers had made the examination for Pacific Mutual in 1956.

On the examination sheets returned by Dr. Rodgers for the policy here in litigation, the final request of the defendant to the examining doctor was:

"Remarks. Under this head please clear up thoroughly all doubtful points. If the party has had any disease or diseases, please give full particulars of the attacks as to severity, duration, and whether there has been full recovery."

In the large space provided for these remarks, Dr. Rodgers wrote only the following:

"Healthy adult male. Good risk."

It will be remembered that the application to the defendant was made at the same time that a similar application was made to Pacific Mutual. On January 29, 1959, the medical director of Pacific Mutual wrote Dr. Holliger, Andre's personal physician, asking *inter alia*.

"Has there ever been any history to suggest cardiac disease? We are of course concerned with the rather bizarre electrocardiographic changes, and I enclose a copy of our current tracing which you are welcome to keep for your records."

The "current tracing" was, of course, the one which was submitted to both the defendant and Pacific Mutual in connection with the report of Dr. Rodgers' medical examination for them.

The defendant's policy was delivered on March 20, 1959. On March 25, Andre, on a business trip to New York, was stricken with an acute heart attack and was hospitalized in the Presbyterian Hospital there from that date until May 12, 1959 with "Acute Myocardial Infarction Arteriosclerotic Heart Disease." Andre was in that hospital again from August 31 to September 1, for tests, for "Enlargement Heart. Arteriosclerotic Heart disease." Andre died, on March 18, 1960, of heart disease.

We summarize what is shown by the foregoing recital. The defendant insurance company's soliciting agents had for five years been trying to sell insurance on Andre's life to him, or to the corporation of which he was president. In January of 1958 they had succeeded in getting Andre to submit an application. Fixa, defendant's general agent in San Francisco, wrote La Pointe, defendant's medical director, that Pacific Mutual had rated Andre in 1956, but added, "If the situation can be improved, we can place a nice case." La Pointe responded that Andre's status was worse than in August 1956, when Pacific Mutual had rated him as a bad risk. Nevertheless the defendant then offered Andre a policy for a small amount at very expensive rates. Andre did not accept it.

The defendant's agents, however, were persistent, and presented another application in January 1959. It was accompanied by a medical report, by a medical examiner for the company who had examined Andre in 1956 for Pacific Mutual, and noted on his report that Andre had been refused insurance in 1956 by Canada Life and had been rated in 1956 by Pacific Mutual, but who nevertheless described Andre, in the report, as a "Healthy adult male. Good risk." Although Fixa had suggested to La Pointe that defendant wait for Pacific Mutual's action on the concurrent application to

it, and although the defendant's agent Horwitz, who had joined in that suggestion, was advised that Pacific Mutual had rejected the application, Horwitz appears not to have passed this word on to La Pointe. La Pointe then computed a premium of 350% of normal plus $15 per thousand per annum for the first three years. He wrote Fixa that such a premium was justified "in view of the applicant's physical condition and history." He had in his hands at the time of making this judgment EKGs running back to 1956, including the one made on December 26, 1957 which he had described to Fixa as showing that "the applicant's status is worse than in August 1956."

The policy of life insurance was issued and the insured died, within two days less than a year thereafter. That was disappointing to the defendant, no doubt, but the defendant was in the insurance business, and no doubt realized that people buy the commodity which insurance companies sell, in order to guard their beneficiaries against the risk that they may not live out their expectancies. The time to pay having come, the defendant did not pay. Instead it cried "foul." It says it was misled and duped into making a promise which it would not have made if it had not been so misled and duped. Considering that the defendant's promise had been made at the end of a year's deliberation and haggling between the defendant and its own agents who were anxious to earn a commission, with which haggling Andre had had nothing whatever to do, and considering the fact that the deliberation was solely about the danger that Andre would die prematurely of heart disease, and considering the fact that the premium 350% of normal plus $15 per thousand for the first three years premium was set solely because of the danger that Andre would die prematurely of heart disease, and the fact that Andre did die of heart disease, the defendant's cry of "foul" has an unpleasant ring. It deserves and will receive careful scrutiny.

The defendant says that Andre gave deliberately false answers to certain questions posed to him on his medical examination. It will be kept in mind that at the medical examination for insurance, the doctor who is the company's agent holds the pen and writes the answers. As to many of the questions there may be discussion between the applicant and the doctor as to whether "yes" or "no" or either of those words is the right answer. If the answer in this situation, as is frequently true in life, needs qualification, that will put the doctor to the trouble of writing, in the "Remarks" space on the form, what may be a rather lengthy explanation of a reason why a cryptic "yes" or "no" answer is not given. The natural tendency of the doctor is to use his best judgment and write a short yes or no.

■ A question which the defendant says Andre deliberately falsely answered was question 19 on the form. It was

"Have you ever been an inmate of, or received treatment or cure at an asylum, hospital, or sanitarium?"

Dr. Rodgers wrote NO opposite that question. Andre had been in Hahnemann Hospital in San Francisco for 48 hours a few months before the examination by Dr. Rodgers. He had been sent to the hospital by his physician, Dr. Holliger, because of a spell of dizziness and numbness. He had been taken to another hospital for an encephalogram; that and the other results of examination were negative; and, at the end of 48 hours, he had walked out of Hahnemann.

Dr. Rodgers and Andre in due course reached question 19 on the form. Since Andre is now dead and the defendant did not call its Dr. Rodgers as a witness, we are obliged, in all fairness, to assume that they were both honest and intelligent. Their first problem would have been as to the meaning of the question:

"Have you ever been an inmate of, or received treatment or cure at an asylum, hospital or· sanitarium?"

"Inmate." "Asylum." "Sanitarium." Clearly these words refer to an institution for mental or nervous disorders. But there is the word "hospital" between the words asylum and sanitarium. Institutions for mental and nervous disorders are sometimes called hospitals. Only in such hospital would a patient be called an "inmate." The words in question 19 about "treatment or cure" could, of course, refer only to the kind of institution included in the question, of which one was an "inmate."

On the medical examination sheet, specific questions were asked about 13 particular illnesses, as well as a question covering accidents, injuries, surgical operations or occupational diseases. As to all of these, of course, it would not have made the slightest difference to the insurance company whether the treatment for these diseases or injuries had taken place in a hospital, or in the insured's home or elsewhere. But as to having been in an asylum, hospital, or sanitarium, a mental institution, the fact of having been an inmate or having been treated there would in itself be important, and the insurance company would desire to know that fact and make up its own mind as to its significance.

By any rational standard of interpretation of language, by the recognized and frequently applied legal doctrine of *noscitur a sociis*, by the doctrine that one who, in a document of this kind, presents an ambiguous question to a layman, who misinterprets the question and gives a wrong answer, cannot turn the layman's mistake to the advantage of the one who wrote the ambiguous question, and by the legal presumption that an otherwise honest and reputable man who has bought and paid for a contract will not be found, after his mouth is closed by death, to have been a cheat and a liar without clear evidence, or at least some evidence, that he was such a character, the answer to question 19 must be found at least to have been an honest answer. We find it also to have been a truthful answer, to the question, rationally interpreted.

There is not even any evidence that the defendant itself, or its agent Dr. Rodgers, interpreted this question as the

defendant now says it should have been interpreted by the layman Andre.

The defendant asserts that Andre gave an intentionally false answer to question 16(a). The question was:

"16. Have you ever suffered from any ailment or disease of

"(a) The Brain or Nervous System."

The recorded answer was no.

When Andre was sent to the Hahnemann Hospital on October 22, 1958, and was there, as described above, for forty-eight hours, his doctor suspected that he had had a slight stroke or "cerebral vascular accident" (CVA).

The hospital record of the examination made on Andre's entrance, in its last item, "Summary and Interpretation," stated, "poss. CVA," apparently meaning "possible CVA." Dr. Holliger testified that that was also his diagnosis; that the next day they had an EEG which was "absolutely negative"; that it might have been his impression that "he may have had a vasospastic—in other words, spasm of the blood vessel rather than actual injury to the blood vessel itself." He testified that perhaps that was the reason that he had not mentioned the October 22 incident in his letters to the defendant and to Pacific Mutual in January, 1959. The electroencephalogram made on October 23 showed:

"A normal EEG.

"There is no indication of focal brain pathology so far as can be determined from the 16 scalp electrode placements."

Andre was in Doctor Holliger's office on October 28, four days after his discharge from Hahnemann. The visit was about a tender right elbow. An x-ray of the elbow was taken and diathermy given. As to the incident of Andre's having been at the hospital four days before, the doctor noted, "Doing okay now. No lack of coordination, speech difficulty. Reflex all right." The doctor in his testimony interpreted his note as saying, "No lack of coordination or speech difficulty." On October 31 Andre came to Dr. Holliger's

office and received diathermy and an ACTH injection for his arthritic elbow. The doctor noted, "Effects from CVA are daily improving; able to focus better and read now." Andre was in again, about his elbow, on November 7 and November 21. He received diathermy and an ACTH injection on November 21. The doctor noted, "Reflexes all okay." He was in again on December 18 about his elbow. The doctor noted, "Reflexes all okay. See in three weeks." He was in on December 29. The doctor noted, "Blood pressure 120/80. Doing okay. No problems. See one month." He was in on February 6, 1959. The doctor noted, "Blood pressure 120/80. Doing okay. No problems. See one month." At no time after the October 22, 1958, incident did Doctor Holliger prescribe any anti-coagulants for Andre.

To return to question 16(a)

"16. Have you ever suffered from any ailment or disease of

"(a) The Brain or Nervous System."

The defendant says Andre was a cheat and a liar because Dr. Rodgers wrote a NO opposite that question. Suppose first that Andre had answered the question without having a doctor as his amanuensis. He had gone to the hospital with a suspected stroke. The electroencephalogram had said, the next day, that its 16 electrodes detected no brain damage, and showed a normal condition. He had walked out of the hospital the next day, and all effects of his incident, whatever it was, had disappeared after a few days. His doctor had never given him any medicine which related to the incident. He had seen his doctor repeatedly thereafter about an arthritic elbow, and after a few days the October 22 incident or its effects received no mention in the doctor's diary. Unless Andre knew more than the encephalogram machine knew, and more than his doctor knew, or knows to this day, he could not possibly have said that he had suffered from an ailment or disease of the brain.

Now let us assume that Andre, when question 16(a) was reached, related to

Dr. Rodgers, the examining doctor, all that had occurred on October 22 and thereafter. We cannot know whether he did or not because, we repeat, Andre is dead, and the defendant has not produced Dr. Rodgers. Would Dr. Rodgers have said, "yes," that Andre had had an ailment or disease of the brain? He could not possibly, as a reputable doctor, have said that without an extended explanation that he was saying it in the face of scientific evidence to the contrary.

It will be remembered that Dr. Holliger, who had at first diagnosed the October 22 incident as a "Possible CVA," had, after further consideration in light of the later developments, so little regard for his preliminary diagnosis that he did not even mention the incident in his reports to the defendant and to Pacific Mutual.

The answer to question 16(a) was an honest answer, and was true, if a categorical yes or no answer was to be given.

The defendant alleges that Andre gave a knowingly false answer to question 16(b). The question was:

"16. Have you ever suffered from any ailment or disease of

"(b) The Heart, Blood Vessels or Lungs."

The answer recorded by Dr. Rodgers was NO. The defendant's attack upon Andre's integrity on the basis of this question and answer really exceeds the tolerable limit of endurance.

The contention is that Andre, on December 26, 1957, advised Dr. Holliger that he had experienced a ten-day episode of chest pains; that his doctor had advised him that the pains constituted angina pectoris and resulted from coronary insufficiency; that Andre, by his NO answer to question 16(b), concealed the fact of these symptoms of heart disease; and that if the defendant had known of them it would have declined to insure his life.

Question 12 of the medical sheet, of course, was answered before question 16(b). Question 12 was as follows:

"12. Have you ever been x-rayed or had an electrocardiogram? If yes, state when, by whom made and explain purpose."

The recorded answer was: "Yes. Dr. Holliger." Dr. Rodgers did not see fit to record when the EKG was made and for what purpose. In fact, it was made on December 26, 1957, the day that Andre reported his chest pains to Dr. Holliger, and its purpose was to discover the condition of Andre's heart. Andre told Dr. Rodgers about the EKG. It is simply inconceivable that Dr. Rodgers would not have asked, as his printed sheet required him to do, what was the time and purpose of the EKG. Nothing short of a strong presumption that any man who is dead was a fraud and a diabolically clever cheat could persuade one that Andre could have disclosed the fact of the EKG and the doctor who had it made, and stopped there without disclosing and without being asked why his doctor caused an EKG to be made. In question 12, Dr. Rodgers was specifically directed to ascertain the purpose of the EKG. Since there is no presumption such as is imagined above, we assume that the defendant's doctor made the further inquiries which he was required by question 12 to make, and did not take the trouble to record the information which he obtained. His failure to do so cannot be attributed to Andre. Yet this is the very information which the defendant now charges Andre with concealing.

But this is not all. On another sheet filled out by Dr. Rodgers on the same day during the same medical examination, which sheet is devoted entirely to information about the heart, there is question 8, as follows:

"Has the applicant ever been told that he had heart trouble or has he been subjected to electrocardiogram or x-ray of the heart? (If yes, give details.)"

The recorded answer was: "Had EKG for this." Again Dr. Rodgers did not follow directions and give details. But the answer which he recorded shows that Andre told him that he had been told that he had heart trouble and that the electrocardiogram which Andre had re-

ported in answer to question 12 on the other sheet was taken "for this." In two places, then, on the medical examination sheets, was the information which the defendant complains that it did not get. If Dr. Rodgers' cryptic and incomplete answers misled the defendant, which we do not think they did, Andre was in no possible way responsible for the completeness or incompleteness of what the defendant's examining doctor wrote. If in fact the defendant did not understand the answers because of their brevity, the doctor was the defendant's man, and could have been asked to complete them.

We return now to question 16(b), the question whether Andre had ever suffered from any ailment or disease of the heart. Dr. Rodgers, who recorded NO in answer to that question, knew that Andre had been told by Dr. Holliger that he had heart disease and that an EKG had been made "for this." Why Dr. Rodgers wrote NO we do not know, and, again, the defendant has not brought him forward to tell us. But it is perfectly plain from the face of the documents that he did not write NO because Andre concealed from him the incident relating to his heart trouble.

It will be remembered that Dr. Holliger, who had had Andre in his care for many years, wrote La Pointe on February 16, 1959: "I have insisted on seeing Mr. Andre at regular intervals, but I have failed to demonstrate any cardiac disease."

There is no merit to the defendant's claims of fraud, misrepresentation, or non-disclosure. They have no support whatever in the evidence.

Although what is said above decides the case, we make an observation about the defendant's contention that it relied on the alleged non-disclosures, in determining whether it would write life insurance on Andre at any price.

Dr. La Pointe, testifying on the question of reliance, spoke of his correspondence with Andre's physician, Dr. Holliger. He said:

"And [he] also submitted to us an EKG which was done on December 26, 1957. This EKG and the two statements from him included nothing unfavorable in the nine years that Dr. Holliger had been observing him."

Dr. La Pointe was mistaken when he so testified. He had forgotten that on April 2, 1958, with the December 26, 1957, EKG in hand, he had written to Fixa, the defendant's general agent, as follows:

"We believe that the applicant's status is worse than in August, 1956."

La Pointe's opinion that Andre's condition was worse must have been based upon the EKG. There was not a word in Dr. Holliger's letter hereinabove quoted to induce that opinion.

The attempt in this case to turn an insurance policy honestly bought and paid for, indeed, paid for through the nose, into an expensive and one-sided lawsuit in which the insured, whose integrity is attacked, cannot speak in defense of his character, deserves and receives our disapproval.

The judgment of the district court is reversed, with a direction to enter judgment for the plaintiff.

HAMLIN, Circuit Judge (dissenting).

I respectfully dissent.

Noble Andre on January 20, 1959, signed an application for life insurance from appellee which contained *inter alia* the following questions and answers.

"12. Have you ever suffered from any ailment or disease of (a) the brain or nervous system? *No*

"(b) the heart, blood vessels or lungs? *No*

"18. Have you ever had chest pains or heart pains or been under suspicion or treatment for possible heart trouble? *No*

"19. Have you ever been an inmate of, or received treatment or cure at an asylum, hospital, or sanitarium? *No*

The district court made findings that Andre's answer "to each of these ques-

tions [1] was false and was known by Andre at the time it was given to be false." He further found in Finding—

"7. In December, 1957, a little more than a year before the application, Andre experienced a ten-day episode of chest pains for which he consulted his doctor on December 26, 1957 and was advised by his doctor on December 30, 1957 that such pains constituted angina pectoris and resulted from coronary insufficiency.

"8. The false answers to each of the questions referred to did not result from inadvertence or misunderstanding as to their purport by Andre but were knowingly made in bad faith by him.

"9. Each of these false answers constituted a misrepresentation to the defendant of the state of Andre's physical condition."

Dr. Holliger, the personal physician of Mr. Andre, testified that on December 30, 1957 he advised Andre after examining him and listening to Andre's story of his symptoms that Andre had angina pectoris which was a heart pain, and the doctor further advised him that he had a coronary insufficiency which he described as "an inadequate blood supply to the heart muscle." A notation of this medical advice appears upon the doctor's records. The doctor's records of October 22, 1958 show that Andre had "sudden

onset, speech difficulty and incoordination today" and that he had a "cerebral vascular accident" (designated C.V.A.). This was described as a "little thrombosis or a rupture of a vessel in the brain." In lay language it is sometimes called a "stroke."

The record shows that Mr. Andre was hospitalized in Hahnemann Hospital as a result of the last above condition from October 22, 1958 to October 24, 1958. The doctor testified that he advised Mr. Andre of the condition of his health. The doctor's records of October 31, 1958 read in part: "Effects from CVA are daily improving, able to focus better and read now."

The majority contends that appellee was aware of the fact that Andre had a heart condition and that therefore appellee did not rely on Andre's statements. Although the appellee was aware that Andre's heart had been damaged at one time, the evidence did not indicate that the company was aware that he had experienced any of the symptoms of an active heart disease. I therefore feel that there was merit to appellee's position that the medical picture presented to it was that of one with arrested asymptomatic heart condition and that knowledge of the symptoms of active heart and circulatory disease which had in fact been experienced by Andre would have materially affected the medical evaluation of his condition.[2]

1. Question No. 18 was not specifically referred to in the district court's findings. However, it was quoted in the court's order for judgment, and Finding No. 7, quoted below, would logically seem to refer to Question 18.

2. In this regard, Dr. Edward Robbins testified as follows:

"A * * * Now the electrocardiogram in 1957, dated 12/26/57, as I stated, shows evidence of damage to the heart, and from this single cardiogram we cannot tell how recent—how old this might be. However, with the knowledge that at this time this man had an episode of ten days of chest pain, then the evaluation of this electrocardiogram assumes very different proportions because a person who has evidence of this much damage, as evidenced by the cardiogram, who

is currently having ten days of chest pain, would be presumed to be having a heart attack or more properly, myocardial infarction. The single electrocardiogram does not enable us to say whether this process is going on, but knowing that this man had ten days of chest pain and knowing that he had a previously damaged heart, one would conclude that this man would very probably be having a new heart attack at this time. And with additional cardiograms available, say, a few days before, a few days after, the cardiogram which we have in hand, these undoubtedly would have shown progressive changes indicating fresh damage to the heart at this time.

"Q Doctor, could we summarize that by saying that it would be the presence of the additional history which would en-

Rule 52(a) provides in part as follows:

"Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses."

It has been held that a reviewing court in considering questions of sufficiency of evidence to sustain the verdict, must take that view of the evidence most favorable to the prevailing party and accept as established all facts which the evidence reasonably tends to prove and give to the prevailing party the benefit of all inferences which may be reasonably drawn from the evidence. Bank of America National Trust and Savings Association v. Hayden, 9th Cir., 231 F.2d 595. Wilson v. New York Life Ins. Co., 250 F.2d 649, 8th Cir.

A finding is "clearly erroneous" when although there is evidence to support it the reviewing court upon the entire evidence is left with a definite and firm conviction that a mistake has been committed. United States v. U. S. Gypsum Co., 333 U.S. 364, 68 S.Ct. 525, 92 L.Ed. 746.

In Bloom v. United States, 9 Cir., 272 F.2d 215 at 223, this court stated:

"Since the finding involved the credibility of witnesses, and since it is supported by substantial evidence, it is conclusive upon appeal. We do not sit to second guess the trial court, nor have we the power to do so under Rule 52(a) of the Federal Rules of Civil Procedure, 28 U.S.C.A., unless the findings are 'clearly erroneous'."

Under the testimony in this case, a portion of which has been set out above, I cannot agree with the following language contained in the majority opinion —"There is no merit to the defendant's claim of fraud, misrepresentation, or nondisclosure. They have no support whatever in the evidence."

able or which suggests an active symptomatic heart condition?

"A That's exactly right.

"Q Whereas, without this history we have a picture of a stabilized, arrested, asymptomatic heart condition?

"A That's right. To repeat, again, the electrocardiogram does not enable us to date the time of the injury to the heart, and it is only by the addition of clinical historical information that we can tell whether this heart damage is old or recent. Therefore, this information is essential to evaluating the medical status of the patient.

\*    \*    \*    \*    \*    \*

"A The knowledge that this man had been hospitalized with symptoms of a stroke in 1958, October 1958—I believe some few months before this application —would materially affect the medical evaluation of this patient. The reason for that is that the mortality or the life expectancy of a person who has had a heart attack may be said to improve as time goes on if the patient is asymptomatic. If we knew that a person had a heart attack in recent times, his life expectancy would be of a certain order of magnitude. If he lives two or three or four years, his chances for survival increase, and the mortality decreases as one increases the time since the heart attack.

Now the knowledge, however, that the patient had in addition to his heart disease, also had a stroke, which is based upon disease of the arteries to the brain, materially affects the evaluation of this patient because there is a certain mortality associated with people who have diseases of the arteries to the brain and we know that these people die at a rate something like two and a half times the rate of population of same age who do not have hardening of the arteries to the brain. Therefore, the knowledge that this man had had symptoms of a stroke a few short months before this application in January of 1959, would materially affect one's evaluation of this man's medical status because the additional mortality to be expected from his cerebral vascular disease would add to the mortality which could be expected from the heart and would make a rather forbidding medical picture."

On the basis of the evidence in the record and Dr. Robbins' testimony, the district court concluded that "defendant relied on the false answers of Andre in issuing the policy and would not have insured his life had it been aware of the true facts concerning his condition which were concealed by his misrepresentations."

I feel that there is ample support in the record for the findings of the court, that the findings are not clearly erroneous, and that the judgment of the district court should be affirmed